BRIAN L. DAVIDOFF (State Bar No. 102654)
bdavidoff@rutterhobbs.com
NEETA MENON (State Bar No. 254736)
nmenon@rutterhobbs.com
RUTTER HOBBS & DAVIDOFF
  INCORPORATED
1901 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
Telephone: (310) 286-1700
Facsimile:   (310) 286-1728

[Proposed] Reorganization Counsel for
Debtor and Debtor-In-Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| In re: | Case No. 2:11-bk-28380-AA |
|---|---|
| CISCO BROS. CORP., a California corporation, | Chapter 11 |
| Debtor and Debtor-in-Possession. | **DECLARATION OF TERRY SHOPE IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** |
| | Date:  TBD<br>Time:  TBD<br>Ctrm:  1375<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

//

//

//

//

//

//

1

DECLARATION OF TERRY SHOPE IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001  900750.2

## DECLARATION OF TERRY SHOPE

I, Terry Shope, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief

1. I am a principal at MPL Consulting, Inc. ("MPL"), the financial advisor to Cisco Bros. Corp., debtor and debtor-in-possession in the above referenced chapter 11 case (the "Debtor"). MPL was engaged by the Debtor to assist with the management of its financial affairs on February 22, 2011. MPL was retained to oversee the financial affairs and cash flow management of the Debtor, provide guidance and assistance regarding management, review and approve material expenditures based upon the existing cash flow and budgeted cash flow, and review and/or implement corporate financials, financial systems and budgeting processes. I am the primary employee at MPL who is responsible for managing and executing these tasks with respect to the Debtor. Accordingly, I have personal knowledge of all major aspects of the Debtor's ongoing business affairs, day-to-day business operations, financial condition, and books and records. Based on my knowledge and experience of the Debtor's operations and my review of its books and records, I am qualified to give this Declaration on behalf of the Debtor.

2. I have been a corporate turnaround, financial, and operational consultant for seven years. Additionally, I have worked as a vice president/account executive, vice president of finance, vice president/general manager, and controller. I, through MPL, have worked with many companies in transition, including companies experiencing financial distress and undercapitalized growth companies, assisting such entities with their restructuring and reorganization efforts. I have worked with companies in several industries, including, manufacturing, technology, home improvement, recycling, and food and beverage.

3. I submit this Declaration in support of the various emergency "first day" motions (the "First Day Motions") filed in this case.

2
DECLARATION OF TERRY SHOPE IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001  900750.2

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, reports prepared for me by the Debtor's management, discussions I have had with the Debtor's employees or my opinion based upon my experience, expertise and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently as to my knowledge regarding the veracity of the facts set forth herein.

A. General Background of the Debtor

5. The Debtor's revenues totaled $10,471,000 in 2007, before decreasing to $7,511,000 in 2009 and subsequently returning to $9,739,000 in 2010. Revenues for the 2010 fiscal year can be categorized as follows:

| | | |
|---|---|---|
| Wholesale | $ 4,355,000 | 44.9% |
| Trade | 1,020,000 | 10.5% |
| Retail | 4,364,000 | 44.6% |
| Total | $9,739,000 | 100.0% |

6. The Debtor's revenues for the first three months of 2011 totaled $2,238,000, which when accounting for the slight seasonality of the furniture business and trade shows, is on pace to approximate 2010 annual revenues. The Debtor's current open orders total $1.6 million.

B. The Emergency Motion Pursuant to 11 U.S.C. §§ 105 and 363 for Order Authorizing Debtor's (A) Continued Maintenance of Certain Existing Bank Accounts; and (B) Continued Use of Existing Cash Management System (the "Cash Management Motion")

7. The Debtor has four bank accounts related to its business operations. Two of these accounts are maintained at Bank of America, including the Debtor's primary operating account bearing account number 0021070087 (the "Main Operating Account") and primary payroll account bearing account number 0370363175 (the "Main Payroll Account"). The

DECLARATION OF TERRY SHOPE IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001  900750.2

other two bank accounts are maintained at Bank of the West, and are also comprised of one operating account bearing account number 014631085 and one payroll account bearing account number 023862060 (collectively, the "Bank of the West Accounts")

8. In addition, the Debtor has six merchant accounts, through which payments made by debit or credit cards are processed from the Debtor's sales locations and corporate office and automatically debited into the Main Operating Account on a daily basis (the "Merchant Accounts"). The daily automatic transfers from the Merchant Accounts to the Main Operating Accounts take place such that approximately every three days, the total balances in each of the Merchant Accounts are transferred into the Main Operating Account. Five of these Merchant Accounts are maintained with US Merchant Services, and one is maintained at American Express.

9. Substantially all of the Debtor's revenues from furniture sales are deposited into the Main Operating Account, including the aforementioned credit card payments, as well as payments via wire transfers and checks deposited by the Debtor's employees, with the exception of certain de minimis amounts transferred into the Debtor's operating account at Bank of the West. Specifically, as of the Petition Date, the Bank of the West operating account balance totals $820.25, which proceeds originated from customer cash-in-advance, overseas deposits, and rentals. The Bank of the West payroll account balance totals $33.26, which originates from the initial deposit upon opening this account.

10. Outgoing disbursements to vendors and other service providers in the form of checks, wires, and debit card payments are also primarily cut, signed, and processed through the Main Operating Account. Disruptions of any of these transactions for even a brief period of time, not to mention the extended period of time it would take to notify all entities doing business with the Debtor that the Main Operating Account has been closed, would have a negative effect on the Debtor's ability to collect its operating revenue. Also, if

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001 900750.2

14. The Debtor pays employees on both weekly and semi-monthly bases, via two separate payrolls. Employees paid on a weekly basis receive their paychecks each Monday, and those who are paid on a semi-monthly basis receive their paychecks on the 15th and last days of each month. Employees who are part of the Debtor's sales force earn commission payable on the 15th of each month.

15. The Debtor funds its payroll checking account via transfers from the Main Operating Account. Payroll checks issued to employees clear directly against the Debtor's Main Payroll Account. The Debtor utilizes a third party automatic payroll service, Primepay, which debits the Debtor's payroll account for taxes two days after payroll is submitted (for example, if payroll is submitted on Friday, checks are issued on Monday and taxes are deducted on Tuesday.)

16. The next scheduled payroll for the Debtor's employees paid on a weekly pay frequency is April 24, 2011 through April 30, 2011 paid on May 9, 2011, and approximately $19,200 of the amount due to be paid on this date constitutes pre-petition wages for which checks have not yet been issued. The next scheduled payroll for employees paid on a semi-monthly pay frequency is April 16, 2011 through April 30, 2011 paid on April 29, 2011 (as April 30, 2011 falls on a Saturday), and approximately $24,000 of the amount due to be paid on this date constitutes pre-petition wages for which checks have not yet been issued. In addition, there is approximately $7,000 in unpaid commission to sales employees that accrued in March 2011, for which checks have not yet been issued, as well as approximately $27,000 in subsequent pre-petition accrued commission scheduled for payment on May 15, 2011.

17. The Debtor regularly reimburses employees for a variety of travel and out-of-pocket business expenses. Employees must submit backup documentation in order to be reimbursed for these expenses. Prior to the commencement of this case, some employees

6

DECLARATION OF TERRY SHOPE IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001 900750.2

incurred various business expenses that, consistent with ordinary practice, are reimbursable by the Debtor. It is difficult to know the exact amount of requested business expense reimbursements until the Debtor receives the underlying documentation from all eligible employees, but it is estimated that the unreimbursed amount of such expenditures as of the Petition Date is not in excess of $7,500.00 in the aggregate.

18. The Debtor provides its employees with certain benefit programs in addition to wages and salaries, including: (i) paid vacation; (ii) a qualified 401(k) plan; (iii) a long term disability insurance program provided through AFLAC which is funded in whole by employees electing to join this program; and (iv) a workers' compensation program for which the Debtor has insurance as required by applicable law (all employee benefits described in this Motion being collectively referred to as "Employee Benefits"). The Debtor must maintain these programs to retain motivated and qualified employees in a competitive labor market. In my opinion, any disruption in benefit programs or the payment of claims thereunder would be extremely disruptive to employee morale and the ability of the Debtor to retain employees.

19. The Debtor's employees are entitled to vacation benefits. Vacation-eligible employees initially accrue vacation time equivalent to one week per year after their first year of employment with the Debtor, and earn an additional two weeks of vacation time thereafter. As of the Petition Date, the Debtor estimates that its outstanding liability for accrued vacation is approximately $39,000, which works out to an average of $700 per employee, excluding shareholders.

20. The Debtor maintains a "401(k) Plan" for its eligible employees. Employees may elect to have 401(k) amounts deducted from their wages and salaries. The deducted funds are handled by a retirement plan services company. The 401(k) Plan provides that employees may defer up to 96% of their eligible pay [Please check with Terry- I have never heard of a 401(k) allowing deferral of 96% of salary], with the Debtor matching 50% of the

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001 900750.2

first 4% of an employee's contribution. Employees are 100% vested upon enrollment into the 401(k) Plan in their own contributions and are 100% vested in employer contributions upon enrollment. The Debtor estimates that it contributes approximately $900 on average per month to the 401(k) Plan.

21. A reconciliation of the payroll account is currently underway. It has recently come to light that approximately $16,839 of 401(k) payments remains outstanding from 2009, which amount represents both employee and Debtor contributions. The breakdown between these balances is currently unclear. The discrepancy occurred during a transition to the current payroll processing provider.

22. The Debtor provides its employees with other miscellaneous benefits, including paid holidays and bereavement leave. The Debtor estimates that both the annual cost of paying these other benefits and the outstanding pre-petition arrearages, if any, are de minimis.

D. <u>The Emergency Motion For Order : (I) Deeming Utilities Adequately Assured of Future Performance; And (II) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to Bankruptcy Code Section 366 (the "Utilities Motion")</u>

23. In connection with its ongoing business, based on my review of the books and records of the Debtor, the Debtor currently obtains electricity, natural gas, water, telephone, sewer, trash removal, and other similar services (the "Utility Services") from approximately 17 companies (the "Utilities") at 9 locations. The Debtor maintains multiple accounts with certain Utilities, so that in total it is the accountholder of 40 utility accounts. The Debtor pays Utilities directly rather than paying through a third party, with the exception of its electricity bill, which it pays through Stroyke Properties, Inc.

///
///
///

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001 900750.2

24. By their nature, the Utility Services are critical to the Debtor's operations and cannot be replaced or interrupted. If any such disruption were to occur, it would negatively affect the Debtor's ability to manufacture its product and make good on basic sales obligations.

25. Attached to the Utilities Motion as Exhibit "1" is a true and correct copy of a list of all or substantially all of the Utilities the Debtor has identified that are currently providing it with Utility Services, along with a breakdown of the average monthly payment for *each* account maintained by the Debtor with these Utilities. This list shall be supplemented to the extent additional Utilities are identified.

26. The approximate total monthly average (calculated using the average of the last six months of payments for each account) of the Debtor's payments to all of the Utilities is approximately $20,529.00. Based on my review of the books and records, it appears that prior to the commencement of its chapter 11 case, the Debtor generally paid all of its utility bills in a timely manner, with the exception of minor defaults or arrearages with respect to undisputed utility bills. This is not inclusive of current charges which, as of the Petition Date, may have accrued but have not yet been billed, or which may have been billed but were not yet due, or amounts whose payment may have been delayed or interrupted by the filing of the Debtor's chapter 11 case. These arrearages are insignificant in amount and were incurred during the period immediately before the chapter 11 filing.

E. <u>The Emergency Motion For Order : (A) Approving Stipulation Authorizing Debtor's Use of Cash Collateral, and (B) Permitting Debtor to Honor Pre-petition Customer Deposits (the " Cash Collateral Motion")</u>

27. The Debtor requires the immediate use of Cash Collateral, as that term is defined in the Cash Collateral Motion, to avoid irreparable harm to the Debtor's estate. Without the immediate use of Cash Collateral, the Debtor will not be able to pay items such

///

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8529.001 900750.2

as payroll and other necessary expenses needed to ensure that the value of the Debtor's assets are preserved for the benefit of its estate.

28. Attached as Exhibit "'1" to the Cash Collateral Motion is a true and correct copy of that certain "Stipulation Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363" entered into between the Debtor, on the one hand, and secured creditor Bank of America, N.A. (on the other hand, authorizing the use of Cash Collateral.

29. Attached as Exhibit "'2" to the Cash Collateral Motion is a true and correct copy of the Debtor's Budget ending May 13, 2011, which the Debtor's management and I prepared upon review of the Debtor's books and record.

30. In the ordinary course of business, the Debtor collects deposits from customers as partial payment for wholesale and retail furniture sales. In these instances, the customer typically makes an initial deposit of 50% of the total anticipated cost. The Debtor is in the process of estimating the total amount of Customer Deposits it is in possession of as of the Petition Date, and expects to have a reliable estimate of this amount at or prior to the time of the hearing on this Motion.

31. Maintaining the satisfaction and goodwill of customers is imperative to the success of any reorganization by the Debtor. If the Debtor is unable to honor the Customer Deposits, its revenues would diminish and its operations would be negatively affected.


RUTTER HOBBS & DAVIDOFF INCORPORATED LAWYERS

8529.001  900750.2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of April, 2011, at Los Angeles, California.

By _____/s/ Terry Shope_____
Terry Shope, Declarant.



**DECLARATION OF TERRY SHOPE IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS**

8529.001  900750.2